IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

DEBRA KINES and STEVEN KINES,

      Plaintiffs,

v.                                                 No. 1:19-cv-01054-JDB-jay

FORD MOTOR COMPANY,

      Defendant.

_____

MEMORANDUM OPINION AND ORDER
_____

*INTRODUCTION AND PROCEDURAL HISTORY*

      This products liability action was initially brought in the Circuit Court of Hardin County, Tennessee, by the Plaintiffs, Debra and Steven Kines, against Ford Motor Company ("Ford") and Long-Lewis Ford Lincoln-Mercury of Corinth, Inc. ("Long-Lewis").  (Docket Entry ("D.E.") 1-2.)  The suit arose from injuries sustained by Ms. Kines while cleaning the interior of her 2018 Ford Explorer (the "Explorer"), a vehicle designed and assembled in part by Ford and purchased by Plaintiffs from Long-Lewis.  The matter was removed to this Court on March 21, 2019, pursuant to 28 U.S.C. § 1332(a).[1]  (D.E. 1.)  On February 26, 2020, the Court granted the joint motion of Plaintiffs and Long-Lewis to dismiss all claims against the latter without prejudice.  (D.E. 96-97.)  On the same day, Plaintiffs amended their complaint, alleging strict products liability and failure to warn against Ford (sometimes referred to herein as the "Defendant").  (D.E. 99.)  The Court conducted a bench trial on November 2 and 3, 2020.  (D.E. 157-58.)  At the commencement of its

_____

      [1]The statute provides in pertinent part that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States[.]"  28 U.S.C. § 1332(a)(1).

proof, Defendant moved for dismissal with prejudice of the failure-to-warn claim, to which Plaintiffs did not object.  The Court orally granted the motion.  Upon careful consideration of the credible witness testimony, exhibits offered at trial, transcripts of the proceedings, the proposed findings of fact and conclusions of law submitted by the parties, and the applicable law, the Court, in accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure,[2] makes the following findings of fact and conclusions of law with respect to the remaining strict products liability claim.

*FINDINGS OF FACT*

At the time of her injury, Ms. Kines lived with her husband in Counce, Tennessee, a small community near the Mississippi border.  She was a trained professional musician who had taught voice and piano for more than twenty years, directed a church music program where she played piano, and had her own jazz band.

Plaintiffs purchased the Explorer from Long-Lewis, a Ford dealership located in nearby Corinth, Mississippi, on March 3, 2018.  The vehicle was equipped with two third-row seats in a tumble-to-fold-flat design that allowed them to be manually lowered from an upright passenger mode to a position providing a flat, level cargo—or "load"—floor when the seats were stowed. They had previously owned 2003 and 2008 model Explorers, both of which also had third-row seats that folded flat into a cargo position.  At the time of purchase, the third-row seats were in the cargo mode and the load floor was level.

Ms. Kines, who drove the Explorer most of the time, reviewed its owner's manual.  The salesperson at Long-Lewis demonstrated how to maneuver the third-row seats between the

---

[2]The rule provides in pertinent part that, "[i]n an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated . . . in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1).

passenger and cargo modes and a video on how to adjust the seats between the two modes was available on Ford's website.

On August 8, 2018, after Plaintiffs had accumulated some 11,268 miles on the Explorer and the vehicle was still under warranty, Ms. Kines had arrived home from returning her two young granddaughters to their father, who lived in Spring Hill, Tennessee, and was preparing to fly to San Antonio, Texas, to join her husband the next day. During their several-days-long visit at their grandparents' home, the girls had ridden in the Explorer and at least one had been seated in the third row.

Ms. Kines was vacuuming the interior of the vehicle and folded the third-row seats into the cargo position in order to clean the cargo space. There were no foreign objects in the vehicle that would have interfered with the action of folding and unfolding the third-row seats at that time. After she folded the third-row passenger side seat, Ms. Kines noticed the load floor had "fallen" on that side. (D.E. 160 at PageID 1899.) This had occurred once or twice previously when she folded the seats into the cargo mode in order to accommodate her musical equipment.

Plaintiffs described Ms. Kines, the daughter and granddaughter of carpenters and contractors and the stepdaughter of an engineer, as the type of person who tries to fix most things herself. Although she did not know what caused the load floor to droop, she found on the previous occasions that she could level it by "rotat[ing]" the third-row seat until it made a "snap[ping]" sound and "pop[ped]" back into place." (*Id.* at PageID 1900, 1938.) The load floor would then be flat. She explained this "rotation" as cycling the third-row seat from the flat position to upright and back a few times from a standing position at the rear opening of the vehicle. Because the problem resolved itself in that manner previously, she had never looked under the load floor.

On August 8, 2018, however, cycling the seat between the upright and cargo modes several times did not remedy the droop in the passenger side load floor.  Ms. Kines then opened the rear passenger door, moved the second-row seat forward, stepped with her right foot into the footwell between the second- and third-row seats, and lifted the load floor.  She discovered a metal bracket, detached from the load floor and lying flat against the floor of the vehicle.  She stated she could observe a hinge on the bracket.

She raised the load floor higher to get a better look at its underside and noticed plastic hook channels into which pins located on the bracket appeared to be supposed to fit.  She identified the problem with the load floor as its disconnection from the bracket, relating in a video prepared for her counsel and introduced at trial that "all I [had] to do is pick up this piece of metal[ and] pop it into those hinges."[3]  (*Id.* at PageID 1951.)  "[I]t looked like an easy fix" to her.  (*Id.* at PageID 1903.)

Ms. Kines reached in with her right hand and pushed the bracket upward to snap it into the hook channels.  In doing so, she could feel "some" resistance, but "[n]ot much."  (*Id.* at PageID 1952.)  As soon as she thought she had the pins reattached, the bracket "let go."  (*Id.* at PageID 1951.)  The mechanism, on which her hand was still resting, quickly "snapped back."  (*Id.* at PageID 1951, 1953.)  She described the spring's force in her trial testimony as being "so strong."  (*Id.* at PageID 1953.)  At the time, she knew the fifth digit on her right hand had been injured but "did not know how it happened."  (*Id.* at PageID 1904.)

At trial, Ms. Kines described her injury thusly:  "The metal cut the tip of [her] finger at an angle, through the fingernail and all through the bone, and [her] finger was hanging off.  And [she]

---

[3]Although she used the term "hinges," it was clear from the context of the testimony that Ms. Kines was actually referring here to the hook channels.

was holding it to keep it from falling in the grass." (*Id.* at PageID 1905.) There was "[l]ots of blood." (*Id.*) Ms. Kines, who was home alone, wrapped the finger in medical tape and was about to attempt to drive herself to the hospital when she saw her neighbor, a nurse, arrive home from work. The neighbor drove her to a hospital emergency room in Corinth and she underwent hand surgery, performed by Dr. James Long, the following day.

On September 18, 2018, Mr. Kines took the vehicle to Long-Lewis' Quick Lane for a routine oil and filter change. He mentioned his wife's injury and was told he would need to take the vehicle to the dealership to have the Explorer checked out. Even though the dealership was next door, he did not do so.

On November 2, 2018, Ms. Kines drove the Explorer to Long-Lewis herself, advised the service manager of her injury, showed him her medical bills, and told him she wanted to file a report. He "popped" the bracket back into place. (*Id.* at PageID 1916.) She drove the vehicle home, assuming the problem was resolved. The service manager did not tell her what to do if the bracket disengaged again, which it did. This time, Ms. Kines did not return it to the dealership but reattached the bracket herself using a crowbar and a mop handle, unwilling to risk a second injury.

Ms. Kines' post-surgery follow-up care was performed by Dr. John Barton Williams at Ortho Memphis. Memphis, Tennessee, where Ortho Memphis was located, was just under two hours from Counce. She saw Dr. Williams on two occasions—in October and December 2018— after which he released her. His notes from her final visit on December 17, 2018, indicated that "things ha[d] totally healed at [that] point," that she did not need additional therapy at that time, and that she was "doing very well for a significant injury." (*Id.* at PageID 1973.) He planned to see her on an "as-needed basis." (*Id.*) She did not return to Dr. Williams.

She had begun physical therapy at Ortho Memphis in October 2018 but stopped because of the distance of the clinic from her home and the pain associated with the therapy tasks. She participated in physical therapy on a total of four occasions, the first two occurring in October and November 2018. Ms. Kines then traveled to Montana to visit her son and did not return to physical therapy for nearly a month. Her final physical therapy session was in December 2018.

The bracket was removed from the Explorer on October 10, 2018, by Donald Robert Phillips, a mechanical engineer retained as an expert by Plaintiffs' counsel. Ms. Kines left the third-row passenger seat in cargo mode until she purchased a replacement bracket on November 2, 2018, from Long-Lewis. Plaintiffs replaced both load floors on February 14, 2020, at a cost of $814.77. The new load floors were identical to those originally installed in the Explorer except that they had four custom designed spring clip retainers built into the hook channels. After the parts were replaced, there were no more issues with detachment.

Ms. Kines testified that, even though the trial occurred more than two years after the injury, the constant pain in her injured finger never diminished over time and worsened if she used it or happened to strike it against an object. The pain affected everything she did; basic daily tasks such as brushing her teeth, combing her hair, and holding a coffee cup and telephone remained painful. She had to give up golfing with her husband. She was able to play the piano or keyboard for just a couple of minutes at a time and with only nine fingers. Because of her injury, she was unable to clean her home as she previously did and had to pay a housekeeper $100 every two weeks to perform those duties. According to her husband, after the injury, his wife of forty-one years did not do many of the things she had done previously and it was clear to him that the finger hurt all the time, sometimes more than others. This had an effect on their intimate relations.

Turning to the products at issue, the load floor is supported by the bracket, which is a Y-shaped spring-loaded hinged piece of metal. The driver's and passenger sides of the vehicle each have a separate load floor and bracket. The narrow, stem end of the bracket points toward the rear and is bolted to the vehicle floor. The wide, pronged end of the Y, which faces toward the front, has two pins, one on the outside of each end of the two prongs of the Y, that hook into channels on the bottom of the load floor and hold it in place. There is a hinge where the narrow and wide ends of the Y join. When the seat is manipulated between the passenger and cargo modes, the bracket moves in order to adjust and keep the load floor level. The spring-loaded hinge allows the bracket to fold and unfold, somewhat like a clam shell, at the hinge point. When the bracket is folded, an opening appears on the outside of the hinge point. The Plaintiffs allege that Ms. Kines' finger was caught in this so-called "pinch" point.

The purpose of the bracket, according to Ford, was to provide an automatic feature to create a flat load floor when the third-row seats were stowed. The bracket was spring-loaded to keep the pins engaged in the hook channels and prevent them from rattling or moving while the vehicle was in motion.

The tumble-to-fold-flat design was first implemented in Explorer models in the 2011 model year.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

(*Id.* at PageID 1845-46 (citing Tr. Ex. 11).) ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████   ██████████████████

███████████████████████████████████████████

██████████████████████ (Tr. Ex. 11.)

Phillips testified that he was aware of 291 warranty claims involving the passenger side load floor and bracket.  This figure was not disputed by Ford.

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████ According to Ford Design Analysis Engineer Jennifer L. Buckman,  notwithstanding  these  alterations,  customer  warranty  claims  concerning  detachment

---

[5]*See* n.4.

continued. 

. (Tr. Ex. 9 at 2.)

(*see* Tr. Ex.

12). Specifically, the document stated

(Tr.

Ex. 9 at 2.)

.

According to the expert testimony, the bracket was designed so that it could be intentionally detached and reattached for purposes of servicing, maintenance, and cleaning. Ford anticipated that some customers would detach the bracket from and reattach it to the load floor themselves. The bracket pins could also unintentionally detach from the hook channels if there was a foreign object in front of the bracket. A detachment of the bracket from the hook channels would cause the load floor to droop instead of remain level in cargo mode. When detached from the load floor, the bracket would fall flat and lie against the floor of the vehicle. The drooping load floor would cover the bracket. If the operator picked up the load floor, the bracket would be fully unfolded and the pinch point would not be visible. To reattach the bracket to the load floor, the operator would have to push the wide end of the bracket upward and fold it back against the spring, which could open the pinch point. During this maneuver, according to Phillips, an operator's finger could become caught in the pinch point.

Buckman testified that "there is a portion of the metal that's up over the spring[ a]nd you do not have to go past that point to reattach the bracket." (D.E. 160 at PageID 2014-15.) The pinch point was covered by a metal plate "for the amount of movement that the bracket needs to be moved in order to reattach it." (*Id.* at PageID 2016.) If the spring is activated more than

halfway, however, the pinch point is open.  She stated that it took "a little effort" to attach the bracket to the load floor, explaining, "It's a C channel bracket.  And the front of the bracket has got a more narrow opening than the channel where the pin on the edge of the bracket sits into that channel.  So you have to go up over and into that channel."  (D.E. 161 at PageID 2080-81.)  She acknowledged that customers were not advised as to how far to push the bracket to reattach it to the load floor.

In photographs introduced as exhibits at trial, Buckman demonstrated on an exemplar vehicle that, even if she spread her hand across the bracket while the pins were rearward of the opening of the hook channels, the pinch point was not open.  (*See* Tr. Ex. 45-47.)  She testified that, in making her demonstration, she tried to manipulate the bracket so that her fifth finger would go down toward the pinch point as Ms. Kines claimed but "it wasn't a natural feeling."  (D.E. 161 at PageID 2147.)  It was natural, she opined, to manipulate the bracket at the top.

Prior to receiving any documents from Ford in discovery, Phillips developed, after his inspection of Plaintiffs' Explorer in October 2018, two possible "fixes" that could prevent injuries from the pinch point.  The first was a secondary "lock" to help keep the bracket pins from detaching from the load floor.  The second was a guard over the hinge that would prevent a finger from inadvertently straying into the pinch point.

Phillips stated at trial that, if an operator while folding the bracket suddenly let go or her hand slipped, the spring would snap back into the unfolded position with sufficient force to chip paint from the vehicle's floor.  To demonstrate this force, he prepared a video, which was made an exhibit at trial, depicting a stick placed in the pinch point being chopped in two when he folded the bracket and then let it go.  (Tr. Ex. 5.)  Ms. Kines testified that it was not until she first viewed this demonstration that she understood how her injury had actually occurred.

In an attempt to evaluate the load floor's design prior to discovery, Phillips sought to purchase a new load floor identical to that originally installed in the Explorer from a local Ford dealer. He gave the service department the Explorer's vehicle identification number, from which the dealer ordered the exact factory replacement load floor for Plaintiffs' vehicle. When he picked up the new load floor, he noted it was identical to the Explorer's load floor except that it had the spring retention clips, which were not present on Plaintiffs' vehicle's original load floor. Thus, in essence, Phillips testified, Ford had designed a lock to keep the bracket and load floor attached to one another. He explained that, "because the spring clips interfered with the movement of the [bracket] pins in the [hook channels] on the load floor, . . . [j]ust pushing on the bracket in a way that would normally have resulted in an unintentional release" would no longer disengage the bracket. (D.E. 160 at PageID 1876.) The expert demonstrated that the retention clips could have been retrofitted onto the Plaintiffs' original load floor. Phillips attempted to install the new load floor into the Explorer. It fit perfectly. He advised Ms. Kines of the design change, which led to her purchase of the new load floors in February 2020.

Buckman offered testimony that, if the bracket was not attached to the load floor, it would stick out forward of the seat. Ford introduced a photograph of the third-row passenger seat of Ms. Kines' Explorer with the seat down and the wide end of the bracket sticking out frontward into the footwell. At this point, Buckman testified, the bracket could not be reattached by "cycling" the seat, as Ms. Kines claimed in her testimony, because it would be forward of the hook channels. She opined that it would be possible, however, if there was something in the footwell that forced the bracket back to where it could engage with the hook channels.

When asked about the date upon which the new retention clips actually began being installed in Explorer vehicles, Buckman explained:

> [I]t's a running change.  So what we do is try to use the parts that we have.  And to change tooling, you have to bank parts.  Because the production of the vehicles doesn't stop.  You still have to build vehicles while you're changing over tools to make different parts and load floors and things like that.  So we have to account for that and account for anything at the suppliers that might have delayed that date.  So I can't give you a specific date.

(*Id.* at PageID 2042.)  She conceded that Ford wanted to—and did—use up its current stock of load floors without the retention clips before installing the newly designed parts.  This, she testified, was a customary practice in the automobile industry.  The new retainer clips, which cost ██████████ per vehicle, would still allow for detachment and reattachment of the bracket for servicing, cleaning, and maintenance.

Buckman insisted that, despite the change in design, the original design of the load floor without retention clips was a good one.  In doing so, she noted that, notwithstanding customer complaints about detachment of the bracket from the load floor, the automaker had to take into account that such detachments could have occurred because a foreign object was brought into the vehicle, which was a factor beyond Ford's control.

Buckman testified that Ms. Kines' injury was the only one of which she was aware involving the bracket.  She acknowledged reviewing a complaint by another Ford Explorer customer, Mirna Funkhouser, regarding injuries she and her son sustained in contacting a bracket with the same part number as that installed in Plaintiffs' vehicle.  Buckman stated, however, that, in her opinion, the injuries to Ms. Kines and the Funkhousers "didn't seem similar at all."  (D.E. 161 at PageID 2149-50.)  At the time of trial, Buckman had not reviewed the warranty data to see if the redesign of the load floor resolved the detachment issue.  She did look for lawsuits involving injuries or deaths caused by the bracket/load floor assembly in Explorer model years 2015 through 2019 and found none.  During that period, approximately 1.2 million Explorers were manufactured.

Buckman inspected the bracket that caused the injury after it had been removed from Plaintiffs' Explorer. She noted the presence of several markings on the coated metal surface of the bracket. In her opinion, the markings were inconsistent with normal use of the vehicle. Specifically, she opined that "it could be something brought into the vehicle that interfered with this bracket." (*Id.* at PageID 2126.) The marks appeared on the side of the bracket that would be facing forward from under the seat. She could find no evidence that the load floor could have caused that type of mark. She acknowledged, however, that the scratches could have come from a metal crowbar coming into contact with the bracket.

Testimony was adduced that Ford had various testing specifications for its systems,



(Tr. Ex. 26 p. 738.)

Despite the testing, however, Defendant continued to receive real world customer complaints about load floors detaching from the brackets.

Buckman could not say and made no allegation that Ms. Kines was misusing the bracket on the date of her injury. The expert saw nothing in Ms. Kines' video or heard anything in her trial testimony that "was against what Ford would expect from [its] customers." (D.E. 161 at PageID 2143.) Nor was it her opinion that Ms. Kines disregarded anything in Ford's owner's manual, quick reference guide, or how-to videos except that she did not take the Explorer to the

dealership if she did not know how a particular part operated. These documents and videos did not address detachment of the bracket or its reattachment to the load floor.

The other Ford customer identified at trial as having been injured by the bracket, Mirna Funkhouser, held bachelor of sciences degrees in mechanical and aerospace engineering and worked toward a master's degree in mechanical engineering. She leased a 2012 Explorer in Monroeville, Ohio, in February of that year. The vehicle, like Plaintiffs' Explorer, had folding third-row seats. She testified in a video deposition offered into evidence at trial that the bracket under the third-row driver's side seat of her Explorer, which appeared similar to that installed in Plaintiffs' model, would unintentionally detach approximately nine out of every ten times she converted the seats between passenger and cargo modes, causing the load floor to droop. The problem began after the first time she converted the seat to the cargo mode. Funkhouser would lift the bracket and attempt to reattach the pins. On numerous occasions, thinking the bracket was reattached, she would remove her hand from the mechanism, only to have it snap back "like a dragon," cutting her hand or wrist. She stated that, "You had to get your hand out of there fast." To avoid having to reattach the bracket and risk injury, she began leaving the bracket detached. The wide end of the unattached bracket would slide forward several inches into the footwell, cutting the backs of her son's legs when he sat in the driver's side third-row seat.

Like Ms. Kines, Funkhouser testified in her deposition that there was no foreign object in her vehicle that would have caused the bracket to disengage. Also like Ms. Kines, when attempting to reattach the bracket, Funkhouser would get into the vehicle between the second- and third-row seats, lift the load floor or seat with one hand and attempt to reattach the pins with the other. She had to push the bracket upward and wiggle it around until it found and snapped into the channels. She described the maneuver as a difficult one.

Funkhouser mentioned the problem with the bracket the first time she took her Explorer to the dealership for maintenance and was informed that the service department had "adjusted" the bracket. The detachments persisted, however. When she visited the dealership for service on subsequent occasions, she asked about the bracket and was told it operated as designed. The dealer did not show her how to reattach the bracket or tell her she should bring it in if it disengaged again. Rather, she was advised to reattach it herself. She eventually filed a complaint with Ford about the recurring detachments. According to Funkhouser's testimony, her injuries did not result from contact with the hinge or the pinch point, but with the area around the pins.

Psychologist David Cades testified as an expert witness in the area of human factors on Ford's behalf. From his investigation, he drew three conclusions: (1) that the available information, if read, understood, and followed, would allow a person in Ms. Kines' position to avoid the injury; (2) that, with the guidance provided, if it had been followed, she would not have interacted with the bracket at all; and (3) the hazard—that is, the pinch point—was open and obvious.[6]

As for the first conclusion, Cades noted that Ms. Kines read the owner's manual when she purchased the Explorer, was aware it contained information relative to folding and unfolding the third-row seats, but did not seek it out on the date of her injury. As a self-described person who wanted to fix things herself, she was "not someone who is going to be motivated or have the goal of consulting the safety information, which are factors entirely intrinsic to Ms. Kines that would make her less likely to comply with safety information that was available." (*Id.* at PageID 2183.)

In drawing his second conclusion, Cades testified that

---

[6]Although the failure to warn claim was dismissed at trial, Ford argued that Cades' testimony concerning warnings was relevant to the issue of Ms. Kines' comparative fault.

> Mr. and Mrs. Kines knew that they had access to the dealership to solve problems and knew that if there were problems they could go to the dealership. However, travel to the dealership requires time and distance. That added cost would contribute to a person's willingness or lack of willingness to comply with information.

(*Id.* at PageID 2185.)

Finally, it was his opinion that Ms. Kines' statement during her testimony that the bracket was simple to fix and common sense indicated that the function of the bracket was open and obvious. Further, he noted that, as soon as an operator touches the bracket, the tension and resistance of the spring can be felt. Thus, if the operator pushes on the bracket, it is obvious that it will spring back. Also, when the operator folds the bracket upward toward the load floor's hook channels, the pinch point opens and can be clearly seen.

It is the position of the Plaintiffs that the tumble-to-fold-flat design of the third-row seat, specifically the bracket/load floor assembly installed in the Explorer, was unreasonably dangerous and/or defective.

## CONCLUSIONS OF LAW

Governing Law.

The parties agree, as does the Court, that the law of Tennessee applies to the instant dispute. Products liability actions brought under Tennessee law, including those based on a strict liability theory, are governed by the Tennessee Products Liability Act of 1978, Tennessee Code Annotated § 29-28-101, *et seq.* (the "TPLA"). Tenn. Code Ann. § 29-28-102(6); *Jones v. WFM-Wo, Inc.*, 265 F. Supp. 3d 775, 778 (M.D. Tenn. 2017); *Coffman v. Armstrong Int'l, Inc.*, 615 S.W.3d 888, 894-95 (Tenn. 2021).

<u>The TPLA.</u>

The "key operative provision" of the statute is § 29-28-105(a), which provides that "[a] manufacturer . . . of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer . . ." *See Coffman*, 615 S.W.3d at 895 (citing *Whitehead v. Toyota Motor Corp.*, 897 S.W.2d 684, 689 (Tenn. 1995)).  Further,

> [i]n making this determination, the state of scientific and technological knowledge available to the manufacturer . . . at the time the product was placed on the market, rather than at the time of injury, is applicable.  Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers . . . of similar products.

Tenn. Code Ann. § 29-28-105(b).

To succeed in a TPLA action, a plaintiff must establish that "(1) the product was defective and/or unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer's control, and (3) the plaintiff's injury was proximately caused by the defective product." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  If the product "was made unreasonably dangerous by subsequent unforeseeable alteration, change, improper maintenance or abnormal use, the manufacturer . . . is not liable." Tenn. Code Ann. § 29-28-108.

There is no question that the proximate cause of Ms. Kines' injury was her contact with the bracket.  Accordingly, the Court will focus its attention on whether the first and second elements of the TPLA claim have been satisfied.

### *Was the Product Unreasonably Dangerous?*

"Unreasonably dangerous" is a defined term under the TPLA.

> [It] means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably

17

prudent manufacturer . . ., assuming that the manufacturer . . . knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8).

The statutory definition provides for two tests:  the consumer expectation test and the prudent manufacturer test.  *Strayhorn v. Wyeth Pharms., Inc.*, 737 F.3d 378, 392 (6th Cir. 2013). These tests "are not exclusive of one another and therefore either or both of these tests are applicable to cases where the product is alleged to be unreasonably dangerous." *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 806 (Tenn. 2001).

"The consumer expectation test assesses 'whether the product's condition poses a danger beyond that expected by an ordinary consumer with reasonable knowledge.'"  *Tatham v. Bridgestone Americas Holding, Inc.*, 473 S.W.3d 734, 750 (Tenn. 2015) (quoting *Ray by Holman v. BIC Corp.*, 925 S.W.2d 527, 529 (Tenn. 1996)).  "Put another way, under this test, a product is not unreasonably dangerous if the ordinary consumer would appreciate the condition of the product and the risk of injury." *Id.* (quoting *BIC Corp.*, 925 S.W.2d at 530) (brackets and internal quotation marks omitted).  The test is, "by definition, buyer oriented[.]" *Maness v. Boston Scientific*, 751 F. Supp. 2d 962, 968 (E.D. Tenn. 2010).

On the other hand, the seller-oriented prudent manufacturer test "assesses whether, given the imputed knowledge of the condition of the product, a prudent manufacturer would place such a product into the stream of commerce. *Tatham*, 473 S.W.3d at 750 (citing *BIC Corp.*, 925 S.W.2d at 530); *see also Maness*, 751 F. Supp. 2d at 968.  This test employs a risk-utility balancing of various factors and, unlike the consumer expectation test, requires expert testimony with respect to the prudence of a defendant's decision to market the product.  *Seaton v. Black & Decker (U.S.), Inc.*, Case No. 2:20-CV-124, 2021 WL 1395560, at *5 (E.D. Tenn. Apr. 13, 2021) (citing cases);

*Johnson v. Electrolux Home Prods, Inc.*, No. 2:09-CV-142, 2011 WL 4397494, at *6 (E.D. Tenn. Aug. 31, 2011); *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 282-83 (Tenn. 2005).

Plaintiffs advocate for application of the consumer expectation test. Ford, on the other hand, appears to favor the prudent manufacturer test. Defendant cites to the Tennessee Supreme Court's decision in *BIC* stating that "the prudent manufacturer test is more applicable to those circumstances in which an ordinary consumer would have no reasonable basis for expectations." *BIC Corp.*, 925 S.W.2d at 531. Some five years after deciding *BIC*, the state's highest court clarified that its "intent in *BIC* was not to limit the application of either test, but to hold that, in order to be successful under the consumer expectation test, the plaintiff must present evidence that the ordinary consumer has an expectation regarding the safety of the product." *Jackson*, 60 S.W.3d at 804 (internal quotation marks omitted). "[E]ven though the consumer expectation test may, technically, apply," the court recognized, "it may be difficult for plaintiffs in cases involving highly complex products to establish that the product is dangerous to an extent beyond that which would be contemplated by an ordinary consumer[.]" *Id.* at 806. Where an ordinary consumer has no reasonable expectation, the prudent manufacturer test may be "the only appropriate means" for establishing unreasonable dangerousness. *Strayhorn*, 737 F.3d at 392. That said, "[e]ven a technically complex failure may involve a subject about which an ordinary consumer may have an expectation[,]" as the expectation "does not depend necessarily on a product's complexity in technology or use but, instead, relies on the common knowledge of consumers as to a product's characteristics and performance." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 968-69, 972 (M.D. Tenn. 2002) (quoting *Jackson*, 60 S.W.3d at 805) (internal quotation marks omitted); *see also Seaton*, 2021 WL 1395560, at *5.

Courts interpreting Tennessee law have concluded that application of the consumer expectation test is appropriate in cases involving seatbelts, *Jackson*, 60 S.W.3d at 804-05 ("[a] seat belt is a familiar product whose basic function is well understood by the general population"); tires, *Tatham*, 473 S.W.3d at 751 (a tire is not "complex" for purposes of applying the consumer expectation test, despite the complexity of the manufacturing process, because the "general driving populace understands the basic function and purpose of a tire"); airbags, *Sigler*, 532 F.3d at 485-86 (an airbag is a familiar product and consumers and manufacturers expected it to deploy in the type of high speed frontal crash alleged by plaintiff); and ATVs, *Whirley v. Kawasaki Motors Corp., USA*, No. 1:04cv1145 T/An, 2007 WL 9706819, at **8-9 (W.D. Tenn. Feb. 21, 2007) (the consumer popularity of ATVs, along with their relatively simple design involving four wheels, suspension, disc brakes, and a wide wheel base, provide sufficient familiarity to give the ordinary consumer a reasonable expectation about ATV safety), but not complex tools, *Coffey v. Dowley Mfg., Inc.*, 89 F. App'x 927, 929-30 (6th Cir. 2003) (a novel automotive repair tool so complicated it was unlikely even the average auto mechanic would have a reasonable expectation of its safety without training should not be evaluated under the consumer expectation test); car radiators, *Simpson v. O'Reilly Auto. Stores, Inc.*, No. 2:13-cv-2684-SHL-cgc, 2014 WL 11514969, at *6 (W.D. Tenn. Dec. 30, 2014) (consumer expectation test inapplicable because, despite their commonness, "ordinary consumers do not have the sort of familiarity with radiators that would engender expectations as to how they would perform"); medical bronchoscopes, *Young v. Olympus Am., Inc.*, No. 07-2547-STA, 2012 WL 252645, at **5-6 (W.D. Tenn. Jan. 26, 2012) (consumer expectation test inapplicable because the ordinary consumer, lacking knowledge that proper practice protocols for bronchoscope at issue required cleaning and flushing with disinfectant between patients to prevent spread of infection, would not have minimum safety expectations with

respect to the product); metal restraint rods on a sophisticated amusement park ride, *Alexander v. Zamperla*, No. E2009-01049-COA-R3-CV, 2010 WL 3385141, at **2, 7 (Tenn. Ct. App. Aug. 27, 2010) (finding prudent manufacturer test more appropriate); industrial forklifts, *Brown v. Raymond Corp.*, 432 F.3d 640, 642, 644-45 (6th Cir. 2005) (in products liability suit involving the wheel well of a co-worker's industrial forklift's entry into the operator compartment of plaintiff's forklift, the prudent manufacturer test was "precisely the type of 'situation' in which the 'ordinary consumer' would not have 'an expectation regarding the safety of the product'"); and boom truck cranes, *Johnson v. Manitowoc Boom Trucks, Inc.,* 406 F. Supp. 2d 852, 857-58 (M.D. Tenn. 2005) (the prudent manufacturer test applied, as "the appropriate design of a boom truck crane and the safety features of such a crane are not within the 'common knowledge of laymen'").

Sport utility vehicles and station wagons featuring seats that fold to allow for additional cargo space have been marketed in the United States for many years and the ordinary consumer is familiar with the function and characteristics of such features. Folding seats are not unlike seat belts, which courts have found "generally are familiar products for which consumers' expectations of safety have had an opportunity to develop, and the function which they are designed to perform is well known." *See Jackson*, 60 S.W.3d at 806 (quoting *Cunningham v. Mitsubishi Motors Corp.*, No. C-3-88-582, 1993 WL 1367436, at *1 (S.D. Ohio June 16, 1993)); *see also Sigler*, 532 F.3d at 486 (same).

Ms. Kines had owned three Ford Explorers with third-row folding seats and was familiar with how they worked. The bracket itself is a simple device. While an ordinary consumer might not have experience with the particular bracket installed in the Explorer, he or she would be familiar with how hinged devices function. Ms. Kines acknowledged that reattaching the bracket to the load floor was an "easy fix" and that the basic function of the mechanism was obvious to

her when she observed it upon lifting the load floor.  Buckman seemed to agree that the bracket/load floor assembly was not complex, noting Ford's anticipation that customers would detach the bracket from and reattach it to the hook channels in maintaining and cleaning the vehicle.

The Court finds, therefore, that the bracket/load floor assembly falls closer on the complexity continuum to seat belts and tires than to industrial forklifts and automobile radiators. *See, e.g., Atkins v. Gen. Motors Corp.*, 725 N.E.2d 727, 733 (Ohio Ct. App. 1999) (in products liability action, a car door hinge is not a complex product warranting expert testimony).  Thus, it applies the consumer expectation test to the issues raised in this case.[7]  Under this test, the Court must determine whether Plaintiffs have established that the bracket/load floor assembly's performance "was below reasonable minimum safety expectations of the ordinary consumer having ordinary, 'common' knowledge as to its characteristics."  *Sigler*, 532 F.3d at 483-84 (quoting *Jackson*, 60 S.W.3d at 806).

The trier of fact is "to employ its own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence."  *Jackson*, 60 S.W.3d at 805-06; *see also Jones*, 265 F. Supp. 3d at 779 (citing *Jackson*).  Whether the plaintiff is successful "will depend on whether the trier of fact agrees that the plaintiff's expectation of product performance constituted the reasonable expectation of the ordinary consumer having ordinary knowledge of the product's characteristics." *Jackson*, 60 S.W.3d at 805-06.  "[E]vidence of a technologically feasible and practical alternative design that likely would have reduced or prevented plaintiff's harm will always be highly relevant and probative of the issue of whether a

---

[7]Accordingly, the Court need not analyze the risk-utility balancing factors required under the prudent manufacturer test.

product was . . . unreasonably dangerous." *Potter v. Ford Motor Co.*, 213 S.W.3d 264, 269 (Tenn. Ct. App. 2006) (citing Tenn. Code Ann. § 29-28-105(b)), *appeal denied* (Nov. 13, 2006).

Ford makes much of its efforts to instruct consumers, through manuals, how-to videos, and sales demonstrations, on the proper way in which to maneuver the third-row seats between passenger and cargo mode. However, there is no evidence Ms. Kines failed to fold the third-row passenger seat from passenger to cargo mode correctly.

The chain of failures leading to Ms. Kines' injury began with the drooping of the load floor on the passenger side after she moved the third-row seat into cargo mode. The droop was caused by the unintentional detachment of the bracket from the load floor. Ford was aware of customer complaints of such detachments and the potential for injury therefrom. Aside from unintentional detachments, the manufacturer anticipated intentional detachments of the bracket by the consumer for the purpose of maintaining and cleaning the vehicle. Prior to the injury, Defendant added clips to the load floors, at a cost of less than ███████ per vehicle, that prevented the bracket from detaching from the load floor on its own. Instead of immediately beginning to install the new design, which, according to Buckman, would have required stopping production, Ford made the decision to first use up its inventory of load floors without the clips. Although Buckman testified that this practice was common in the automotive industry, the fact that it did so with the knowledge of customer complaints and the potential for injury is disturbing to the Court. Moreover, according to Phillips' testimony, the clips could have easily been added to the load floor originally installed on the 2018 Explorer at issue, but there is no evidence that any Ford vehicles were recalled in order to do so.

Obviously, the ordinary consumer does not expect to nearly lose a digit when cleaning her family sport utility vehicle. Even though the pinch point is indeed open and obvious when it is

folded over, there is no evidence Ms. Kines ever observed it in that position. She testified that, when she lifted the load floor and saw the bracket for the first time, it was detached, unfolded, and lying flat on the vehicle floor. In that position, the pinch point was closed and not visible. When detached from the vehicle and in the hands of experts and lawyers under the bright lights of a courtroom, it is clearly easy to appreciate the nature of the bracket—in particular the size and exact location of the pinch point and the strength of the spring. In the vehicle, however, from the vantage point of an adult crouched tightly, and no doubt awkwardly, in the floorboard between the second- and third-row seats and looking under the load floor at an object she had never actually handled before, the potential dangerousness of the bracket is not quite so obvious. While her injuries differed from those of Ms. Kines, Funkhouser's experience was similar in that the bracket in her 2012 Explorer had repeated unintentional detachment issues and Funkhouser was injured on numerous occasions while attempting to reattach the bracket. In addition, her frequent complaints to her local Ford dealer, an action that, according to Defendant, would have kept Ms. Kines from being injured, did nothing to put an end to Funkhouser's continuing bracket detachments and injuries.

The Plaintiffs have established by a preponderance of the evidence that the bracket/load floor assembly's performance was below the reasonable minimum safety expectations of the ordinary consumer having ordinary, common knowledge as to its characteristics.

*Was the Product in a Defective Condition?*

In the alternative, Plaintiffs submit that the bracket/load floor assembly was in a defective condition. The term "means a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2). A plaintiff bears the burden of identifying a product's alleged defect. *Seaton,* 2021 WL 1395560, at *3 (citing *Langford*

*v. Gatlinburg Real Estate & Rental, Inc.*, 499 F. Supp. 2d 1042, 1051 (E.D. Tenn. 2007)).  Defects under Tennessee law include those involving a product's design or manufacture.  *Id.*  "A manufacturer is not required to design a product that is perfect, accident-proof, or incapable of causing injury."  *Id.* (quoting *Crown Equip.*, 181 S.W.3d at 282).  "Mere proof of an accident, by itself, does not establish that the product is defective."  *Tatham*, 473 S.W.3d at 750.  Nor does the mere "failure or malfunction of the device."  *King v. Danek Med., Inc.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000), *appeal denied* (Nov. 6, 2000, July 9, 2001).  "A plaintiff must show that there was something wrong with the product and trace the plaintiff's injury to the specific defect."  *Id.* (internal citation omitted); *see also Browder v. Pettigrew*, 541 S.W.2d 402, 406 (Tenn. 1976) (establishing that a product is defective under the statute requires proof, "in a general sense and as understood by a layman, that 'something was wrong' with the product").

As noted above, Buckman testified that Ford anticipated that customers would handle the bracket by detaching it from and reattaching it to the load floor.  She also stated that she neither saw nor heard anything in Ms. Kines' video or testimony beyond what Ford anticipated and expected of its customers.  Thus, Ms. Kines' handling of the product was normal and anticipatable.  Based on the evidence presented, the Court finds that Plaintiffs have successfully carried their burden of demonstrating that the bracket/load floor assembly in their Explorer was unsafe for normal or anticipatable handling.

*Did the Defect Exist at the Time the Product Left Ford's Control?*

For Ford to be liable under the TPLA, the defect must have "existed at the time the product left the manufacturer's control[.]"  *Sigler*, 532 F.3d at 483.  If the product was "made unreasonably dangerous by subsequent unforeseeable. . . abnormal use, the manufacturer . . . is not liable."  Tenn.

Code Ann. § 29-28-108.  It is Ford's position that Ms. Kines handled the bracket assembly in an abnormal and unanticipatable way by attempting to reattach the bracket to the load floor herself.

As discussed in the previous section, Ford's argument is belied by its own expert's testimony involving the automaker's anticipation with respect to customer handling of the bracket. Indeed, Defendant's expert admitted that the bracket was designed to be detachable for the purpose of maintaining the vehicle.  Nor did Buckman consider Ms. Kines' actions on the day of her injury beyond Ford's expectations from its customers.  In so testifying, Buckman effectively admitted that Ms. Kines' handling of the bracket was neither abnormal nor unanticipatable.

Defendant also submits that Ms. Kines engaged in abnormal use of the bracket/load floor assembly by failing to handle the bracket by its top edge, the farthest portion of the bracket from the pinch point.  While Buckman considered handling the bracket from the top edge more "natural" for her, again, she could not say Ms. Kines was misusing the bracket on the date of her injury or that her description of her actions went against Ford's expectations of customers' use of the vehicle.  Moreover, as Ms. Kines, unlike Buckman, was unaware of the pinch point, she had no motivation to avoid the danger.

Further, Ford presented evidence at trial that the bracket could detach from the load floor if it came into contact with a foreign object located in or around the footwell.  The Court assumes Defendant was attempting to persuade it that there must have been something in the footwell that caused detachment of the bracket and that such "abnormal" use resulted in Ms. Kines' injury. However, she testified, credibly, that there was nothing obstructing the bracket when it unintentionally detached from the hook channels.  Funkhouser made the same claim in her deposition with respect to the bracket in her 2012 Explorer.  Ms. Kines also credibly explained that, after the injury and prior to replacement of the bracket/load floor, she attempted to reattach

the bracket with a crowbar and mop handle.  While, in examining markings on the Plaintiffs'

bracket, Buckman testified they could have come from a foreign object in the footwell, she stopped

short of discounting the possibility that they could have come from a crowbar or mop handle in

the hands of Ms. Kines as she attempted to reattach the bracket to the load floor.  It is the conclusion

of the Court that the defect in the bracket/load floor assembly existed at the time it left Defendant's

control.

As the Plaintiffs have established all of the elements of their TPLA claim, they are entitled

to judgment against Ford.

Damages.

In the operative complaint, Plaintiffs sought compensatory damages in an amount totaling

more than $750,851.25 for physical and emotional pain and suffering, past and future medical

expenses, loss of enjoyment of life, loss of earnings, disfigurement, and loss of consortium, as well

as post-judgment interest and statutory and discretionary costs.  (*See* D.E. 99.)  Plaintiffs also

asserted a claim for punitive damages.  (*Id.*)  In an order entered September 16, 2020, the Court

granted Ford's motion for judgment on the pleadings on the issue of punitive damages.  (D.E. 129.)

Pursuant to the pretrial order, the amounts of ascertainable damages in this matter were

listed as $5,559.06 in medical bills, $814.77 in parts and labor for replacement load floors, and

$49.09 for installation of a replacement passenger side bracket.  Plaintiffs omitted the cost of

replacing the bracket from their proposed findings of fact and conclusions of law.  The Court

therefore assumes they no longer seek judgment against Ford for that item.

At trial, the Court orally granted the Defendant's motion to dismiss with prejudice Plaintiffs' claim for lost earnings, past and future, to which the Kineses did not object.[8]

In their post-trial filing, Plaintiffs, in addition to medical expenses and the cost of the replacement load floor, proposed that the Court award them $48,135.00 for loss of future services relating to the cost of housecleaning expenses; $97,037.62 for Ms. Kines' future pain and suffering; $16,677.18 for past traumatic pain and suffering; $85,000.00 for her loss of enjoyment of life; $10,000.00 for her disfigurement; and $50,000.00 for Mr. Kines' diminished companionship, love, and affection, for a total award of $313,223.63.

Tennessee follows the "49 percent rule" of comparative fault. *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992); *see also Sawyer v. DDRTC Turkey Creek, LLC*, 3:18-CV-00349-DCLC-HBG, 2020 WL 7655172, at *6 (E.D. Tenn. Dec. 23, 2020). That is, if a plaintiff's fault is determined to be less than the defendant's fault, the plaintiff's damages will be reduced in proportion of the percentage of the total fault attributed to the plaintiff. *McIntyre*, 833 S.W.2d at 57. This comparative fault principle applies to products liability actions based on strict liability in tort. *Lofgren v. Polaris Indus., Inc.*, ___ F. Supp. 3d ___, 2020 WL 8410450, at *8 (M.D. Tenn. Dec. 23, 2020) (citing *Whitehead*, 897 S.W.2d at 693), *motion to amend denied*, 2021 WL 1022751 (M.D. Tenn. Mar. 16, 2021). The trier of fact "will determine the percentage of a plaintiff's damages that is attributable to the defective or unreasonably dangerous product as well as the percentage that is attributable to the plaintiff's own fault." *Whitehead*, 897 S.W.2d at 693.

Defendant submits that, because Ms. Kines ignored Ford's warnings and instructions to take her vehicle to a dealership if she had a problem and elected instead to handle the bracket/load

---

[8]At trial, the Court also orally denied Defendant's motion to exclude evidence concerning Funkhouser. Accordingly, the Clerk is DIRECTED to terminate D.E. 135.

floor assembly herself, she is at least fifty, if not 100, percent responsible for her injuries. The Court disagrees.

Ford issued no warnings or instructions to its customers directly relating to the bracket/load floor assembly. Even though the automaker instructed customers generally to take their vehicles to a dealership if a problem arose, it nonetheless anticipated that customers would handle the bracket. While Buckman testified that it was not necessary to push the bracket far enough toward the rear of the vehicle to expose the pinch point in order to reattach the pins to the hook channel, no warnings or instructions provided by Ford advised customers of that fact. Ms. Kines had never seen the bracket prior to the day of her injury, only observed it when it was flat on the vehicle floor in a position in which the pinch point was not exposed, and was not aware of how her injury occurred until the pinch point was shown to her much later. Moreover, Funkhouser's experience with a Ford dealership, albeit not the dealer from which the Plaintiffs purchased their Explorer, suggests that, even if they had taken it to Long-Lewis for assistance, any complaint would not have been taken seriously. The Court finds that Ford is 100 percent at fault for Ms. Kines' injuries.

Defendant also maintains that, because Plaintiffs' claim for housecleaning expenses was not included in the pretrial order, they cannot now make any claim therefor. The Court finds this argument persuasive. *See Gregory v. Shelby Cty., Tenn.*, 220 F.3d 433, 442-43 (6th Cir. 2000) ("This Circuit has held that a party's failure to advance a theory of recovery in a pretrial statement constitutes waiver of that theory."). Accordingly, Plaintiffs' claim for housecleaning expenses is DISMISSED.

Further, Defendant contends that Plaintiffs' recovery of monies expended for replacement of the load floor is barred by the economic loss doctrine. The doctrine is "a judicially created principle that reflects an attempt to maintain separation between contract law and tort law by

barring recovery in tort for purely economic loss." *Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 488 (Tenn. 2009). Economic loss includes damages for the costs of repair and replacement of defective goods. *N5ZX Aviation, Inc. v. Bell*, No. 3-11-0674, 2011 WL 5520973, at *4 (M.D. Tenn. Nov. 14, 2011). It has been held that the doctrine bars claims for such costs. *See Meadow v. Nibco, Inc.*, No. 3-15-1124, 2016 WL 2986350, at **6-7 (M.D. Tenn. May 24, 2016). As the bracket/load floor assembly was the defective product itself, the economic loss doctrine bars recovery of monies expended by Plaintiffs for replacement of the load floor.

This leaves the following categories of damages: future pain and suffering, past pain and suffering, loss of enjoyment of life, disfigurement, and loss of companionship. Damages for pain and suffering are awarded for the "physical and mental suffering that accompany an injury." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 (Tenn. 2013). "Pain and suffering encompasses the physical and mental discomfort caused by an injury" and "includes the wide array of mental and emotional responses that accompany the pain, characterized as suffering, such as anguish, distress, fear, humiliation, grief, shame, or worry." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 715 (Tenn. Ct. App. 1999) (internal citation and quotation marks omitted), *appeal denied* (Oct. 4, 1999). Lay testimony is sufficient to support recovery for past pain and suffering. *Seaton*, 2021 WL 1395560, at *8.

In this case, Ms. Kines testified that the bracket cut the tip of her finger, which was "hanging off," and there was "[l]ots of blood." (D.E. 160 at PageID 1905.) She elaborated:

> I ran into the house with the vacuum still going, and got a towel. But I could not let go of it, because I couldn't even grab the towel without holding the finger on my face to keep it from falling. Because I was afraid I was going to lose the tip of my finger. And so I got a towel. But the blood just kept going and going. I wasn't quite sure what to do. I was home alone. My husband was out of town. And we had only moved there a few months prior. I didn't know anybody. So I ran to the medicine cabinet. And I got medical tape. And I couldn't tear it off with my hand, because my finger kept falling off. So I had to tear it off with my teeth to get enough

> tape to wrap my finger and to put it back together.  And that's what I did.  I kept
> wrapping it and pushing it, and pushing the nail and the bone back on.  And kept it
> that way. . . .  I actually had to talk myself into not fainting by myself.

(*Id.* at PageID 1905-07.)  The following day, Dr. Long reattached the bone, the fingertip, and the

nail.  (*Id.* at PageID 1909.)  At the time of trial two years later, she remained in constant pain.  The

Court finds that Ms. Kines is entitled to recovery for past pain and suffering.

An award for future pain and suffering, however, usually requires proof in the form of

expert testimony, such as that of "a medical person, a doctor testifying to that effect."  *Williams v.*

*Steward*, No. 02A01-9712-CV-00311, 1998 WL 408795, at *3 (Tenn. Ct. App. July 22, 1998).

Here, no testimony was taken from a physician at trial.  Nor were any medical records introduced

as exhibits.  During Ms. Kines' testimony, Ford's counsel read from a December 17, 2018, visit

note of Dr. Williams, which was not entered as an exhibit, in which he stated that "things have

totally healed at this point" and that he would see her again on an "as-needed basis."  (D.E. 160 at

PageID 1973.)  She never returned to his office for further treatment.  Thus, what little proof of a

medical nature that is before the Court does not support Ms. Kines' claim of future pain and

suffering.  Accordingly, the Court declines to award such damages.

"Disfigurement is a specific type of permanent injury that impairs a plaintiff's beauty,

symmetry, or appearance."  *Overstreet*, 4 S.W.3d at 715.  Plaintiffs presented no evidence of any

disfigurement at trial.  Specifically, no opportunity was offered to the Court to inspect the digit

and no photographs were introduced into evidence that might have shown scarring or other lasting

evidence of Ms. Kines' injury.  Moreover, there was no testimony that her finger impaired her

appearance or that she was in any way self-conscious about it.  Therefore, there is no basis upon

which to award damages for disfigurement.

"Damages awarded for loss of enjoyment of life are intended to compensate a plaintiff for

the impairment of the ability to enjoy the normal pleasures of living."  *Meals*, 417 S.W.3d at 420.

"This type of damage relates to daily life activities that are common to most people," but "can also compensate a victim for the loss of uncommon individual pursuits or talents." *Overstreet*, 4 S.W.3d at 716.

Ms. Kines testified that she has had to readjust everything she does to compensate for the constant pain caused by her injury, including how she shampoos her hair, brushes her teeth, picks up and holds her coffee cup, and holds a telephone. She and her husband often played golf prior to her injury but, afterward, she could not hold the club comfortably and has not completed a round of golf since. Her piano playing is now limited to a couple of minutes and she can play with only nine fingers. She can no longer teach keyboard or clean her house as she did before the injury. She is, however, able to wear various types of finger sleeves and/or straps that lessen the sudden pain should she strike her finger on an object. According to Mr. Kines, his wife's injury rendered her unable to play the piano for pleasure, to accompany herself in rehearsing for performances, or to play for her grandchildren on visits or holidays. He added that she often kept the finger extended to keep from knocking it against something. Intimate relations such as hugging, holding hands, or using hands to embrace would occasionally bring her nearly to tears from the pain. The Court finds that Ms. Kines is entitled to recovery for loss of enjoyment of life.

"Loss of consortium consists of several elements, encompassing not only tangible services provided by a family member, but also intangible benefits each family member receives from the continued existence of other family members, including attention, guidance, care, protection, training, companionship, cooperation, affection, love, and in the case of a spouse, sexual relations." *Parker v. Epstein Enters., LLC*, No. W2019-00311-COA-R3-CV, 2020 WL 2731234, at *22 (Tenn. Ct. App. May 26, 2020) (quoting *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 602 (Tenn. 1999)) (internal quotation marks omitted). Based on his testimony summarized

in the preceding paragraph, the Court finds that Mr. Kines is entitled to recovery of loss of consortium damages.

*CONCLUSION*

For the reasons articulated herein, the Plaintiffs are entitled to judgment against Ford on their TPLA unreasonably dangerous/defective products liability claim in the total amount of $45,559.06.[9]  A separate judgment shall enter.

IT IS SO ORDERED this 15th day of July 2021.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[9]In the operative complaint, Plaintiffs also sought future medical expenses, post-judgment interest, and statutory and discretionary costs.  (*See* D.E. 99.)  As any such claims were not included in Plaintiffs' proposed findings of fact and conclusions of law, the Court assumes they have been abandoned.